MEMORANDUM OF DECISION
This case presents a petition for the termination of the parental rights of Frank I. and Kimberly W. to their two children, Susan I., now age five, and Francine W., now age four. In 1994, both children were removed from the parents' home and placed in foster care by the Department of Children and Families (hereafter, "DCF") due to the poor living conditions existing at the home. On May 18, 1994, both children were adjudicated neglected and committed to the care and custody of DCF. Extensions of the commitment were granted in 1995 and 1997. On May 17, 1997, DCF filed a petition for termination of parental rights as to Susan and Francine.
The court finds that the mother and father have been personally served with the petition for termination, have appeared and have court-appointed attorneys. The Court has jurisdiction in this matter and there is no pending action CT Page 4291 affecting custody of the children in any other court.
Petitioner, DCF, alleges two grounds in its petition for termination of parental rights. The first is that, after a finding of neglect, mother and father have failed to rehabilitate themselves. The second is that there is no on-going parent-child relationship. Parents have denied both charges.
FACTS
The court, having read the verified petitions, the social studies, and the various documents entered into evidence, and having heard the testimony of various witnesses and evaluators over three days of trial, as well as having taken judicial notice of the prior record in this court as to both children, makes the following factual findings and reasonable inferences supported by those facts:
The two children in this matter were removed from the home of mother and father by an order of temporary custody obtained by DCF in April, 1994. DCF presented evidence by way of affidavit that the children (then one and under a year) were left unattended. Mother and father had been charged by the New Haven police with risk of injury to minors. The children were placed in a foster home by DCF and they remain there presently.
Neglect petitions were filed on April 13, 1994, as to each child and pleas of nolo contendere were entered on May 18, 1994. At the same time, expectations were signed by mother. Father was incarcerated and agreed orally with DCF to a service agreement. Mother's expectations were approved by the court. The service agreement was disclosed to the court. The expectations and service agreement looked toward reunification on the meeting of certain conditions. Mother and father were to take substance abuse counseling, remain drug free, have visitation and other appropriate contact with their children, and avoid any contact with the criminal justice system.
Each parent failed to meet the court-ordered stipulations for reunification. Mother was arrested on several charges in late 1994 and the beginning of 1995 and, in July, 1995, went to the Niantic Correctional Institution; she was released from incarceration in December, 1996. She was drug dependent before her incarceration and continued so afterwards. She tested positive for narcotics in June, July, August, and September, CT Page 4292 1997. By December, 1997, she had entered a long-term, in-patient treatment program, which has not concluded to date. Until entering this program, she refused or failed to complete a variety of programs, such as SATU and MAAS, offered by DCF. She testified that she is a recovering narcotics addict and has only recently started the arduous process of recovery from her self-described nightmare.
Father was arrested on several dates subsequent to the granting of the OTC which resulted in the removal of the children from the home. As a result of the arrests, he served time in prison from April, 1994, to September, 1994; from November, 1995, to December, 1996, and from June, 1997, to August, 1997. He was placed under house arrest for one month in January, 1998, the first stage of a four-year probationary term. He was addicted to and under the influence of illegal substances through June 18, 1997.[2] Father was offered services at SATU and MAAS prior to his incarceration of June 18, 1997, but failed to complete offered programs.
The incident which led to father's incarceration in June, 1997, highlights father's problems up until the date of his arrest. Brian Faughman, who was a West Haven policeman at the time, testified that he was called to a Domino's Pizza restaurant because a man had offered to trade drugs for a pizza. Faughman encountered the man outside the restaurant, discovered two packets which appeared to be crack cocaine next to his car, and attempted to arrest this man. A struggle ensued in which Faughman was injured. He believes that the suspect swallowed the packets before they could be recovered. This man was identified in court as Frank I., the father-respondent herein.
Mother tried to keep up contact and visited the children when she incarcerated. Father was often incarcerated between 1994 and 1997. He asserted that he always tried to keep up visitation and testified that he was hindered in visitation by DCF while incarcerated. The record does not reflect that conclusion. DCF offered a visitation schedule to father. Visits did take place under this schedule. When father was in prison, visits decreased, but this was due in part to a failure in communication. DCF rightly insisted that father contact the assigned social worker to arrange for a visit, and not to attempt to arrange visits through father's mother. Sometimes father could not obtain permission of corrections officials to make calls to DCF and other times he was changing his location in the prison system. He CT Page 4293 never wrote to DCF attempting to establish a new visitation schedule when he went to prison. There was a counselor at each correctional institution who had the responsibility to serve as a liaison to DCF. Father stated that he did not know about the counselor. He also admitted that he was often depressed by his drug condition and was unwilling to have a visit, and this appears to the court to be the main reason visits did not occur.
In March, 1997, social worker Karen Ertel, who was working with the children, and court-appointed psychologist, Dr. David Mantell, both recommended that visitation be curtailed. The children were beginning to show adverse behaviors after the parental visits. At one time Susan became highly agitated; another time, while acting out, she pushed her foster mother's arm against a car window and broke her arm. Dr. Mantell observed the interaction between mother and father and the children and was concerned enough to write to the court that these visits were harming the children. Based upon the testimony of these counselors, the court concluded in August, 1997, that the ending of the visits was appropriate. It does not appear that the children's behavior occurring after the visits was related to any trouble in the foster home. At the time of the difficulties, both parents were drug dependent and this had to have an effect on the children.
Subsequent to his arrest on June 18, 1997, father has taken several steps to improve his status. In jail for parole violations until August, 1997, he detoxified from cocaine and decided to try to remain substance-free. Father's behavior has improved since his release in August, 1997. His mother and friends testified that he is, in contrast to pre-June, 1997, clean and neat in dress, involved in religious and community activities, and attempting to find work.
To modify his substance abuse habit, father enrolled in SATU in August, 1997. A counselor at SATU, Reverend Augustin Margary, testified that for the first six months, participants are placed on the drug, Naltrexone, which blocks the craving for cocaine. Father completed this six-month course successfully. He has moved to the next phase, a period during which no medication is administered. This phase usually is also six months in duration. Due to newly-imposed managed care rules, however, the second period at SATU is only three months in length. Father will have to take another program of after-care for a period of time to be determined by SAGA, a division of the State alcohol and drug CT Page 4294 department, CADAC.
Father has remained drug-free since June, 1997. He still has serious issues remaining, however. One illustration of this is that father displayed uncalled-for anger at an administrative case review held in October, 1997. The DCF social worker stated that she was frightened by his behavior. Reverend Margary believes that father has psychiatric deficiencies, such as impulse control and hyperactivity, and suggested that father follow up with a psychiatric evaluation. A preliminary oral report by Dr. Zimolo, a psychiatrist at SATU, to Reverend Margary did not indicate a psychiatric problem.
On March 25, 1998, the court granted father's motion for a written report from Dr. Zimolo, due on or before April 15, 1998. On April 10, 1998, father's attorney wrote to the court to indicate that Dr. Zimolo had refused to provide a written report, as only a forensic psychologist or psychiatrist would be qualified to make such a report. Father asked in this letter for additional time to secure another psychological evaluation. This request was the subject of a hearing on April 16, 1998, and was denied for the following reasons. At the pretrial conducted in this court on October 17, 1997, it was agreed by the petitioner and both respondents that Dr. Mantell would conduct an interview with father to update his March, 1997, evaluation. On October 21, 1997, father moved that he be given an evaluation with a psychologist other than Dr. Mantell. This was opposed by DCF and father let the motion go off the calendar. Father's attorney wrote to the court on November 21, 1997, agreeing to Dr. Mantell as the appropriate evaluator.
After father missed one appointment in early January, 1998, Dr. Mantell did conduct his evaluation on January 21, 1998 (exhibit 8). During the TPR trial, on March 24, 1998, father again moved that he be given another evaluation. The court denied this motion. On March 25, 1998, as indicated, the court did permit father until April 15, 1998, to obtain a written report from Dr. Zimolo. The court indicated at that time that there was to be no other extension, in the instance where the additional report could not be obtained through Dr. Zimolo. Father represented at that time that Dr. Zimolo was familiar with father's situation, had given a preliminary report, and would be able to develop a written report by April 15, 1998.
In light of the age of this case, the pretrial proceedings CT Page 4295 and orders and the fair and comprehensive reports of Dr. Mantell, the request for further evaluation was denied. Cabrera v.Cabrera, 23 Conn. App. 330, 344 (1990).
Reverend Margary also reported that 80% of all addicts who go through his program have a serious relapse. Father has not completed a follow-program, which will take him until the end of this year. It is likely that at least one more year would be required to establish father's likely recovery from substance abuse.
Father proposes as a plan for reuniting with his children that he gradually be allowed to take over their custody and that the foster parents be eased out of the children's life. He would eventually settle with his children in a house owned by father's mother. Father also suggests his mother, a retired school teacher, as a caretaker when he is at work.
Dr. Mantell's testimony and reports (Exhibits 7 and 8) are instructive on father's status and plan for reunification. Dr. Mantell found that Susan and Francine are bonded and very close to the foster parents. The foster parents are the psychological parents. A plan to separate the foster parents and the children, as proposed by father, would cause grave psychological consequences to the children.
Both father and mother have alleged that the foster parents have engaged in coaching the children so that the biological parents efforts at reunification have been hindered. Dr. Mantell disagreed with this contention. Based upon interviews of the children and his observations of both the biological and foster parents, he believes that the coaching argument is factually incorrect and may only be a psychological reaction being raised by mother and father.
Regarding father's plan, Dr. Mantell believed it to be unworkable to the degree that it relies upon paternal grandmother, Joanne I. Dr. Mantell found her a somewhat nervous, intelligent woman, in a troubled relationship with her two sons and her own elderly father. He concludes that she could not properly serve as a resource. In part, based on Dr. Mantell's views, DCF has also concluded that father's permanency plan is unworkable.
Dr. Mantell had concluded in his original evaluation of CT Page 4296 father (Exhibit 7) that father was drug dependent. In the up-dated report, based upon a January, 1998, interview with father (Exhibit 8), Dr. Mantell concludes that father is still psychologically impaired, even though his drug addiction has improved to an extent. Dr. Mantell clearly favored allowing the children to be freed for adoption by the foster parents. He testified that mother and father have no parent-child relationship with Susan and Francine, have failed to rehabilitate themselves and continue to have personal problems of a psychiatric nature.
With regard to the present status of the children, DCF social worker, Paulette Limato, testified that the children are in the foster home where they had been placed since April, 1994. The children love their foster parents and call them "mommy" and "daddy." She believes that the children have waited four years for the parents to rehabilitate themselves, and now the need for permanency for the children requires that termination of parental rights be ordered. DCF recommends a permanency plan of adoption by the foster parents.
ADJUDICATION[3]
The court finds by clear and convincing evidence that as of the date of the filing of the petition for termination of parental rights, May 19, 1997[4], mother had failed to rehabilitate herself as required by General Statutes § 17a-112 (c)(3)(B). The children had been committed as neglected to DCF on May 18, 1994, and, at the time of the termination petition, mother had failed to achieve such a degree of personal rehabilitation as would encourage the belief that, within a reasonable time, she could assume a responsible position in her children's lives. At the time of the filing of the termination petition, mother was, by her own admission, an addict and was refusing treatment. It was only in December 1997, that mother entered a drug treatment program. Again, by mother's own admission, she has not completely recovered to date. Clearly mother cannot resume a constructive and useful role as a parent in any reasonable time. See In reMigdalia M., 6 Conn. App. 194, 203, 504 A.2d 532 (1986); In re Luis
C., 210 Conn. 157, 166 (1989) (failure to rehabilitate where child had bonded to foster parents, visits had not been successful and mother's improvement would not occur within a reasonable time).
In addition, the failure to meet expectations is evidence of CT Page 4297 a failure to rehabilitate. In re Shavoughn K., 13 Conn. App. 91,100, 534 A.2d 1243 (1987). Mother failed to comply with the court-ordered expectations in that she continued to have contact with the criminal justice system and continued to abuse substances.
With regard to father, the court finds by clear and convincing evidence existing at the date of the filing of the termination petitions that father also had failed to rehabilitate under General Statutes § 17a-112 (c)(3)(B). Father's mother, Ms. Joanne I., testified that on May 19, 1997, father was drug-dependent. Ms. I.'s friend, Linda Raccio, testified that before June, 1997, father was hyper, hostile, rude and appeared to be abusing drugs. Father himself testified that it was only after his arrest for the embarrassing "drugs for pizza" incident on June 18, 1997, that he decided to break with the life of being a drug addict and seek assistance. He had previously ignored or failed to complete counseling as recommended by DCF prior to June, 1997.
Father has therefore not achieved a restoration of his parenting abilities, and a reasonable time has passed to accomplish rehabilitation, considering the ages and needs of his children. In re Luis C., supra at 167, In re Christina V.,38 Conn. App. 214, 221 (1995).
Father has also not complied with the service agreement, which became an order of the court. He sporadically visited the children, engaged in substance abuse and had many inappropriate contacts with the criminal justice system. As indicated, the failure to meet court-ordered provisions is evidence of the failure to rehabilitate. In re Shavoughn K., supra.
Petitioner, DCF, also relies upon the ground of failure to maintain an on-going parent-child relationship, General Statutes § 17a-112 (c)(3)(D). The court finds for respondents on this claimed ground as regards the child Francine. She was removed from the parents' home at six months. The opportunity to develop a parent-child relationship was curtailed. See In re Valerie D.,223 Conn. 492, 534, 613 A.2d 748 (1992).
DCF should prevail on this ground against respondent parents as regards Susan. DCF has proved by clear and convincing evidence that Susan has "no positive memories or feelings for her natural parent." In re Jessica M., 217 Conn. 459, 468, 470, 586 A.2d 597
(1991). Dr. Mantell indicates in his March, 1997, report (exhibit CT Page 4298 7), after interviewing Susan, that she has only negative thoughts towards her biological parents. Dr. Mantell wrote to the court that Susan was becoming ill after her visits with the parents. In addition, the situation is likely to continue for the foreseeable future. No additional grant of time to the parents to improve the situation is appropriate. In re Kezia M., 33 Conn. App. 12
(1993).
The court also finds that the facts warranting adjudication have existed for more than one year prior to the filing of the termination petition.
DISPOSITION
Having found that the grounds exist for termination of parental rights, the court must now consider the appropriate disposition. Here the focus is not on the parents, but on the best interests of the child. The court may consider the evidentiary time-frame up to the present. In re Tabitha P., supra
at 367 (see footnote 4).
Mother is still in long-term drug care. Father spent a great deal of time at trial describing his post-June 1977 status. He is to be complimented on his progress, but, as Dr. Mantell indicates, he is still not in a position at this time to resume his role as a parent. Finally, the children are in a loving foster care placement, which is appropriate to assume adoption. The attorney for the children recommends termination. The required findings are addressed below.
REQUIRED FINDINGS
The court makes the following factual findings required by § 17a-112 (e):
1. Appropriate and timely services were provided by DCF, including counseling, visitation coordination, and drug counseling. DCF assisted the parents by making visits available at the DCF offices. The agency supplied bus tokens for parents' transportation. When the parents were incarcerated, DCF arranged to bring the children to the correctional institutions.
Mother was offered a variety of services, including in-patient psychiatric services at St. Raphael's Hospital, and out-patient chemical dependency services; the Central Treatment Unit (CTU); CT Page 4299 SATU; MAAS; city welfare for income and substance abuse evaluations; a drug program at Niantic Correctional Center; and the Legion Avenue Clinic. She never completed her drug programs prior to her entering into the current placement in December, 1997.
Father was offered in-patient services at CVH for detoxification; CTU; city welfare; SATU; MAAS; NA/AA meetings while incarcerated; New Haven Family Alliance for a parenting class; and the Fathers' Helping Fathers' group. The drug programs were not utilized prior to August, 1997. Father commenced SATU in August, 1997, and has stayed with the program to the present.
2. The court finds by clear and convincing evidence that DCF made reasonable efforts to reunify the family, given the situation and circumstances, as far as possible. Until July, 1997, DCF established visitation between the parents and children and always urged the parents to try counseling for their drug problems. Only recently father has taken advantage of DCF's recommendations regarding substance abuse treatment, but it is too soon to know whether he will eventually succeed in conquering his drug habit.
3. DCF, with the approval of the court, set reasonable and realistic expectations and service agreements in order to reunify the family. As indicated, mother did not meet her expectations and father failed to meet the terms of his court-ordered service agreement.
4. The children have strong emotional ties with the current foster family who have provided the emotional and educational support these children need. The therapists have testified that the children each have only negative memories of their biological parents.
5. Finding regarding the age of the children: Susan is five and Francine is four.
6. Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the children to return them to their home in the foreseeable future and (A) the extent to which the parents have maintained contact with the children as part of an effort to reunite the children with the parents, provided that the court may give weight to incidental visitations, communications or CT Page 4300 contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the children.
Mother has not made realistic and sustained efforts to conform her conduct to even minimally acceptable parental standards. Until August, 1997, father also gave no thought to adjusting his circumstances to improve his status as a parent. He has recently begun to consider how he might improve his conduct as a parent, but giving him additional time would not likely bring his performance as a parent within acceptable standards to make it in the best interests of the children to be reunited. Inre Luis C., supra; In re Juvenile Appeal, 183 Conn. 11, 15
(1981). Mother did visit the children as long as it was appropriate; father did not have as much visitation, as was discussed above.
7. While the parents' means were limited, economic factors did not prevent regular, continued contact with the children or the foster parents. The children, mother and father and the foster parents live in reasonable geographic proximity. DCF encouraged contact. No unreasonable conduct by DCF occurred. While parents contended that the foster parents tried to interfere with reunification, the court has concluded that based on Dr. Mantell's testimony no unreasonable conduct occurred by the foster parents.
The court finds, based upon the testimony and evidence presented, that it is in Susan and Francine's best interests to terminate the parental rights of Kimberly W. and Frank I. to them. These findings are made after considering these children's needs, the length of time they have been separated from their family of origin, their need for a secure and permanent environment, the relationship they have with their foster parents, and the totality of circumstances surrounding their short lives. This court is aware of the "deleterious effect of prolonged temporary care of abused and neglected children." In reJuvenile Appeal (83-CD), 189 Conn. 276, 292, 455 A.2d 1313
(1983).
The Appellate Court has also noted, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence. . ." In re Alexander V.,25 Conn. App. 741, 748, 596 A.2d 930 (1991). Justice Berdon, concurring recently in Pamela B. v. Ment, 244 Conn. 296, 340
CT Page 4301 (1998), quoted from a study by an ABA commission as follows: "Children cannot wait for years for a determination that they should be returned to their natural parents [or] placed permanently in an adoptive home. . . . The delays that are annoying and frustrating to adults . . . can permanently damage children and their families." For these two children, too much time has already been taken up in waiting for the impossible to happen and they have languished in a temporary status for more than four years.
ORDER
Based upon the foregoing findings, the court determines that it is in Susan and Francine's best interests for a termination of parental rights to enter with respect to the biological parents, Kimberly W. and Frank I. and it is ORDERED that the parental rights of Kimberly W. and Frank I. are terminated. DCF is hereby appointed the statutory parent. A permanency plan for both children shall be submitted within ninety days. A review plan for them shall be filed in accordance with state and federal law.
Henry S. Cohn, Judge Child Protection Session
[2] This was the commencement date of father's last incarceration. The evidence is clear from father, his mother, and a variety of his friends that father was actively drug dependent until that date.
[3] No finding is necessary pursuant to General Statutes §17a-112 (c)(1), because the court (Brenneman, J.) on January 9, 1997, had found that efforts to re-unify were not appropriate and Judge Clarence Jones made the same finding on November 5, 1997. See General Statutes § 17a-110(b).
[4] "In the adjudicatory phase, the court is limited to events preceding the filing of the petition or the latest amendment." Practice Bk. § 33-3 (a)(1998); In re Tabitha P.,39 Conn. App. 353, 367 (1995).